ADDIE NEAS, Respondent, v. CHICAGO BURLINGTON & QUINCY RAILWAY COMPANY, Appellant.

St. Louis Court of Appeals, Submitted April 15, 1909. Opinion Filed June 8, 1909.

1. INSTRUCTIONS: Personal Injuries: Negligence: Presumptions. In an action for wrongful death, where the deceased was killed while running a handcar on a railroad track by being struck by a moving train, an instruction that if the jury found the railway company's employees operating the train became aware of peril of the deceased in time "to have by the exercise of ordinary care sounded the whistle and have averted the injury and they failed to exercise said care or sound said whistle, and that by reason of such failure to exercise ordinary care the said whistle was not sounded in time to avert said injury—then the jury must find for the plaintiff" was erroneous because it assumes that such exercise of ordinary care and such sounding of the whistle would have averted the danger.

2. ————: ————: ————: ————. And in such case an instruction that "unless at the time of the injury the employees of defendant in charge of said train used the means at their command to provide for the safety of the deceased after they discovered his eminent peril, the jury may find a verdict for plaintiff" was erroneous because it assumes that the signal, if it had been given by the train men, would have been heard by the deceased and averted the danger.

3. **CONTRIBUTORY NEGLIGENCE: Railroads: Knowledge of Danger.** Where the deceased was an employee of the railroad company, had notice of the rules of the company requiring him to use red and white lights on a hand car when running it at night, had been warned not to run a hand car alone, was familiar with the train times and knew that the train by which he was killed was due to pass about the time the accident occurred, and was killed by a moving train while running a hand car in violation of such rules, he was guilty of contributory negligence as a matter of law, and his legal representatives cannot recover for his death.

4. **NEGLIGENCE: Railroads: Duty of Employees Operating a Train.** Where the deceased was running a hand car which was struck by a moving train whereby deceased met his death, and where the evidence showed that his fatal injuries were received from the impact with the moving train, it was not negligence on the part of the employees of the railroad company operating the train to fail to stop the train immediately after the accident.

Appeal from the Audrain Circuit Court.—*Hon. James D. Barnett,* Judge.

REVERSED.

*H. H. & Palmer Trimble* and *Fry & Rodgers* for appellant.

A presumption based on another presumption; an inference drawn from another inference, are not competent evidence to submit to a jury. They have no probative force, and it is error for the court to refer any such fact proposition to a jury for its decision upon such evidence. Citations *infra.* The court was not justified in submitting to the jury the question as to whether the enginemen (or either of them) became aware of the peril of Levi S. Neas before striking his handcar, when the answer to such question must necessarily be an inference derived from another inference, and when such inference is illogical, unnatural, improbable and contrary to experience. It is the province of the court to determine whether this evidence was

competent and had any probative force.    Railroad v. Henrice, 92 Pa. St. 433; Graham v. Railroad (Iowa), 43 A. & E. 811, 817, 18 L. R. A. 599.    Presumptive evidence of a fact is not to be indulged where there is direct proof.    Where direct and positive evidence is introduced, mere presumption becomes secondary evidence and can not be indulged.    Moberly v. Railroad, 98 Mo. 185, and cases cited; Burke v. Walsh, 118 Iowa 397, 92 N. W. 66, and cases cited; Hawkins v. Railroad, 135 Mo. App. 524.

*P. H. Cullen* and *Jno. D. Orear* for respondent.

The proof showed that the death of Neas was caused by the carelessness and negligence of the servants in charge of the train, and therefore plaintiff was entitled to recover as the following authorities clearly show: Lynch v. Railroad, 208 Mo. 1; Schlerith v. Railroad, 115 Mo. 87; Payne v. Railroad, 105 Mo. App. 155; Sullivan v. Railroad, 97 Mo. 113; Kelley v. Railroad, 95 Mo. 278; Eppstein v. Railroad, 197 Mo. 720; Railroad v. Jacobson, 28 Tex. Civ. App. 150, 66 S. W. Rep. 1111; Hawley v. Railroad, 71 Iowa 717, 29 N. W. 787; Railroad v. Simpson (Tex. Civ. App.), 86 S. W. 1034; Slette v. Railroad (Minn.), 55 N. W. 137; Railroad v. Erb (Ind.), 73 N. E. 939; Howard v. Canal Co., 40 Fed. 195, 41 Am. and Eng. R. Cas. 473, 6 L. R. A. 75.    It was the duty of the engineer running defendant's train to have given warning to the deceased by sounding of the whistle after they discovered his peril, and their failure to sound whistle is negligence for which the company is liable.    Hinzeman v. Railroad, 199 Mo. 65; Hinzeman v. Railroad, 182 Mo. 611; Chamberlain v. Railroad, 133 Mo. 604.

STATEMENT.—Plaintiff commenced her action in Audrain County Circuit Court to recover $10,000 damages claimed by reason of the death of her husband, July 14, 1907.

The petition on which the case was tried—after averments of incorporation of defendant and that it was operating its road on July 14, 1907, from Old Monroe to Mexico, Missouri, passing near the towns of Martins-burg and Benton City, Missouri, and that Levi S. Neas, her husband, was on that date, "by the defendant carelessly and negligently killed, avers" that her said husband was in the employ of the defendant as section foreman on the section lying near the towns of Benton City and Martinsburg in Audrain county, and as such it was his duty to do and perform such labor on defendant's track as was required of him, or as the duties of his position called upon him to perform.

"Plaintiff says that it was a part of the duty of the defendant to carry and transport certain hands employed by the defendant and certain tools used and owned by the defendant, from its station at Benton City to its station at Martinsburg, by means of a handcar operated over the track of said defendant; and that on the 14th day of July, 1907, in obedience to the order and direction of the defendant he took charge of a certain handcar at or near Benton City and carried to Martinsburg aforesaid a number of hands employed by the defendant and a number of tools used by defendant and delivered said hands and tools at the station at Martinsburg; and that his residence was at Benton City and the handcar which he was using was required to be kept at Benton City and it became and was his duty to run said handcar back from Martinsburg to Benton City after delivering the said hands and tools aforesaid; and that while he was returning on the tracks of said defendant propelling the handcar aforesaid, the handcar and himself were struck by an engine and train operated and controlled by the defendant, running west on the tracks aforesaid.

"Plaintiff further says that the employees of the defendant railway company saw and knew, or by the exercise of due diligence might have seen and known,

that her said husband was propelling a handcar on the tracks in a perilous position and unaware thereof and unable to escape from impending danger; that the said defendant and the said servants negligently failed to sound the usual and ordinary signals of danger in time to avert the injury, or at any other time, and negligently and carelessly failed and neglected to stop or slacken the speed of said train in time to avert an injury or collision, when, as a matter of fact, said train might by the exercise of due care, have been stopped, or the speed thereof slackened in time to avert the collision and injury, and if said signals had been given, either before or after her said husband's peril was or might have been discovered, as they might and should have been given, had the defendant exercised due care, said collision and injury would thus have been averted.

"And plaintiff further says that when said engine struck said handcar the said handcar was running west and the said engine was also running west and when the said engine struck the handcar it threw her said husband down upon the floor of said handcar and hurt but did not fatally injure him, but the said servants, in charge of said train and engine, though they knew, or might by the exercise of ordinary care have known, that they had struck said handcar and thrown her said husband down thereon, negligently and carelessly failed to stop said train, but negligently and carelessly continued to run said train at a rapid rate of speed for a mile or more, pushing said handcar in front thereof, and causing the handlebars and other appliances of said handcar to work very rapidly.    And plaintiff alleges that said handlebars were worked very rapidly and caused to strike her said husband who was then lying upon the floor of said handcar, and said handlebars and appliances beat and injured him to such an extent as to cause his death, though he was not dead at the time the train was stopped but lived several hours thereafter. And plaintiff alleges that he died as the joint result of

injuries received both after the engine collided with the handcar and which were inflicted upon him while said. handcar was being pushed along the track by said engine; and that if the agents and servants of defendant had stopped their train even when they struck the handcar his death would not have resulted."

The answer, after general denial, proceeds:

"Defendant, further answering, says that plaintiff's decedent, Levi S. Neas, was, at the time of his alleged injury, in the employ of defendant as a section foreman, but, at said time was a trespasser on the railroad track of the defendant; that the time and hour of his injury, if he was injured, was about 2:52 o'clock a. m., and that said Levi S. Neas had no right or duty on the defendant's track in the nighttime; that he was not in the service of the defendant or doing anything in connection with or relating to the business of the defendant at the time of his alleged injury; that his day's work began about 7 a. m., and ended at 6 p. m.; that he quit work at 6 p. m. the afternoon preceding his injury; that his duty did not require him to be on defendant's track; that neither the defendant nor any of its servants knew, or had any reason to know or anticipate or expect that said Levi S. Neas was on its track at the time of his alleged injury.

"Defendant further answering says that plaintiff's decedent, Levi S. Neas, was injured as a direct result of his own negligence and carelessness contributing thereto, in that he negligently and without. authority from defendant, expressed or implied, and while under the influence of intoxicating liquors, undertook, late in the nighttime (when and where he was not on duty and at an hour when his duty did not require him to be on the tracks of the defendant), when it was very dark, to run and have a handcar on the main track of the defendant's road where said road had only a single track, without any assistance and protection against defendant's trains which he knew might, at any time,

pass over and along the track where he was and on which he had said handcar; that, without keeping a lookout for said trains on defendant's said track and knowing the trains of the defendant were liable to pass at any time over the track when and where deceased was, with said handcar, at the time of the alleged injury; and he especially knew that defendant's train No. 25 was due to pass the point where it is alleged deceased was injured, at the time of his alleged injury; that deceased failed to look out or listen for or get out of the way of said train; that said Levi S. Neas knew that the agents and servants of the defendant in charge of its trains, passing over its track at the hour of the alleged injury to said Levi S. Neas, did not know he was on said track with a handcar and had no reason to expect or anticipate the presence of persons and handcars upon said track at the then hour of the night; that the defendant, long before the time of the alleged injury, made and promulgated rules for section men, which said rules at the time were, and had been for a long time prior to the alleged injury, in force; and which said rules forbade section foreman to allow handcars to be used on defendant's said track except when doing the work and service of the defendant and forbade section foremen to have a handcar on the main track at night, except with a white light displayed on the front and a red light in the rear of said handcar and defendant says that Levi S. Neas at the time complained of, negligently and carelessly failed to observe said rules and such failure contributed directly to his injury.

"Further answering, the defendant says that the train which injured Levi S. Neas, if he was injured, was on schedule time, as it approached and passed the place where Neas was injured and was run and managed just as all other trains of defendant were run and managed when approaching and passing said point in the nighttime and that said Levi S. Neas assumed the risk of being injured, while upon defendant's track with

the handcar in the nighttime, and plaintiff is not entitled to recover.

"Further answering, defendant says that it was the duty of said Levi S. Neas to keep defendant's track free from obstructions and in a safe condition for the trains of defendant to pass over said track, and that the said Levi S. Neas, in violation of his duty, went upon said track in an intoxicated condition in the night as aforesaid, with the handcar, which said handcar was an obstruction on said track and imperiled the safety of defendant's trains and its employees and passengers thereon and the plaintiff should not have maintained this suit and has no right to recover herein."

The reply is a general denial of all new matter.

At the trial before the court and a jury, the plaintiff introduced as a witness on her behalf Elmer Anderson, who was the engineer running the engine at the time of the accident. He testified that he remembered the circumstance of Neas being found in front of his engine on July 14, 1907. His run was from St. Louis to Francis, and running from St. Louis to Francis, passed through Martinsburg and Benton City. These two stations are about six miles apart. Had not stopped at Martinsburg that night; was running a through express passenger train and that night was running between these two stations at rate of thirty miles an hour; was due to arrive at Benton City at 2:47 a. m., and was on time—therefore passed Martinsburg at about 2:30 or 2:35 a. m.

Between Martinsburg and Benton and about sixty-five car-lengths east of the station house at Benton, as he said (saying a car-length was about forty feet) the engineer testified that he discovered sparks flying from the front of his engine; when he made the discovery of the sparks, he was going at a rate of about thirty miles an hour; he had been constantly watching the track ahead of him, except when he took his eyes off for a few seconds to look at his watch, which he did by

taking it out of his pocket, leaning down in front of the firebox and reading the figures on his watch by the light thrown out when the door of the firebox was open; that he had looked at his watch about two minutes before he had discovered the sparks. Except looking at his watch, which took from three to five seconds, and watching his water and steam gauges and occasionally looking back to see whether the train was all right, that is to see whether there was evidence of any hot boxes on any of the cars of the train, he had kept his eyes toward the front, although he would not undertake to say that he had them constantly in that position; in the intervals was running the engine, as he always did and looking out for everything in general, looking in front of the engine and back at the train and at his watch and at the different gauges. After discovering the sparks he walked out on the running-board of the engine and discovered that there was a handcar locked to the pilot, whereupon he at once returned to the cab and stopped the engine—brought it to a standstill within about six hundred feet; that was about the shortest distance, he said, in which he could have stopped his engine at the rate he was running. When he stopped the engine he was between a quarter or half a mile west of the station at Benton City; between Benton City and Francis, the latter place being the end of his run. The engine had run entirely past Benton station for about a quarter of a mile, he said, but he afterwards said about fifty car-lengths, which, according to him, would be about two thousand feet. The handcar had been struck and fastened to the pilot before he went out on the running-board. Doesn't know where on the run his engine struck the handcar. Discovered the sparks, went out on the running-board, found the handcar there, went back and stopped the engine and when he succeeded in stopping it he was, he said, about an eighth or quarter of a mile, but as he also said, measuring by car-lengths, between a quarter

and a half mile west of the station. After stopping the engine, he and his fireman got out of the cab, walked along the side of the engine, went forward and found Neas, the husband of plaintiff, lying on the handcar. They helped him off, or carried him off, and laid him in the baggage car and took the handcar off the track. When they found him, Neas was lying with one of his legs partly over the end of the car, lying diagonally across it. He was lying on the end of the handcar nearest the engine, his feet toward the southeast, that is to say, toward the engine, and his head a little toward the northwest. He was alive when they found him and all he said to them was, "Take me home." His left leg was badly bruised and one of his arms appeared to be bruised, although witness was not certain about that. Witness discovered in moving Neas that the leg was limp. He did not appear to have any use of either his arms or legs at that time. Asked where Neas was with reference to the movement up and down of the handlebars, witness answered that he was lying on the platform of the car. Asked if Neas was lying in such a position as to be struck by the downward movement of the handlebars he said, "Well, I couldn't say. I don't hardly think he was. . . . He was lying on the platform of the handcar. I don't think the handlebars would strike him." His attention being called to a deposition which it appears he had given before, but which was not introduced, he said that after reading it, he would repeat that he doesn't believe the handlebars would strike him; doesn't believe they came down low enough. Asked if, since reading his deposition, he could state what his recollection was as to whether or not the man on the handcar was so situated he would be hit by the handlebars as they worked up and down, he said: "I don't think he was. He was lying on the platform and the bars, I don't think, would come down low enough to strike him." These handlebars are about four feet long, he said, and the point where the lever

works is about eighteen and twenty inches above the
floor of the car. The rear wheels of the handcar were
elevated off of the rails and caught into the pilot of
the engine. Neas was lying with his head right close
to that part of the handcar which covers the machinery,
that is, the elevated box or part in the middle of the
handcar, and he was lying on the platform of the car,
his feet toward the engine and his body was under
the handlebars. In the collision of the handcar with
the pilot of the engine, as appears by the testimony of
Anderson, the engineer, the axle nearest the engine was
bent. The handcar, as appears by the evidence, had
four wheels moving, of course, on two axles, and the
one nearest the engine was the one that was bent.
This axle was about one and a half inches in diameter,
and Anderson testified that he thought it was bent or
bowed in three or four inches, probably. There is
about a foot and a half of board between the axle and
the end of the floor of the car. This board in the end
of the car next to the engine was split, the platform
boards of the car being fastened to a crosspiece.
Whether or not the crosspiece was split, Anderson was
not able to say; he had not examined it. All the marks
which were on the pilot or cowcatcher of the engine
consisted of a little of the paint being rubbed off where
it had struck the handcar. This, said the witness, was
rubbed off from the nose of the pilot; it did not look
like it had been sandpapered, but had the appearance
of being struck a severe blow or force of some kind.
There were no lamps or lights on or about the hand-
car.

Another witness, Mr. Willis, section foreman who
succeeded Neas on his section after his death, described
the condition of the handcar a little more particularly
and described the handcar, which he saw at the place
where it had been removed from the track about a
quarter of a mile west of the station (Benton City) the
Monday following this accident. Mr. Willis testified

that the axle was bent and that that was the axle to which the machinery by which the car was moved was attached.  There is a small wheel attached to the axle and above this small wheel is a large wheel called the "bull wheel," and the action of the handlebars or levers is directly thrown on this bull wheel, as we understand the testimony; that is, the gearing that the handlebars were attached to, is directly in contact with the big wheel or bull wheel and that wheel in turn moves a smaller wheel fixed on to and directly moving the axle. This section foreman testified that if the forward wheels, to the axle of which the machinery of the handlebars were attached, was off of the rails, as was the case here, and those wheels not in motion, the handlebars would not work.  That is, shoving the handcar along with the two front wheels resting on the track, as was the case here, would not set in motion the machinery moved by or by which the handlebars were moved.  He further testified that in examining these two wheels, on the morning after the accident, he found that the cogs of the big wheel had been stripped off, broken off, and that with these off, even if the two rear wheels of the handcar had been on the track and moving, the handlebars would not have moved; with the front wheels to which the gearing which propels the car off the track and the car shoved on on the two front wheels, the handlebars would not move.  He further testified that even if the rear wheels, to which the gearing was attached, had been put on the track and the car shoved ahead or shoved along, the handles would not have worked, because the cogs were stripped off of the bull wheel and the axle bent.  Owing to the latter cause, he testified that he did not think that the back wheels would have stayed on the track; the axle being bent or bowed in, would have drawn the wheels in closer to the car so that they would not have fitted on the rails; the bending of the axle had shortened the length of the axle. This bull wheel or large wheel, he testified, was between

twelve and fifteen inches in diameter and the cogs were about an inch and a half wide and about half an inch deep and about half of them had been broken off. Asked if he knew how these cogs were broken off, he said that he did not know, but he supposed that the lick or blow from the engine that had hit the car was what broke them off. The wheel itself was not broken. It was an iron wheel, with a rim to it, and for a distance of half of its circumference the cogs were broken off; had not noticed the little wheel and did not know whether the cogs were broken on that or not. The floor of the handcar was broken, the crosspiece was not broken. He explained this by saying that the floor or platform of the handcar extends over the car some two inches. The planks which extended over this were about eighteen inches long, tacked on with sixpenny nails and the impact tore off or tore loose one end of three planks. The crosspiece was not broken or moved. When he examined the car this Monday morning he saw that it wouldn't run and glanced over the wheel and saw that it was broken, that is, the cogs were broken off and the axle bent and both of these occurring was the reason the car could not have been run on the track. The axle was bent so much as to throw it up against the frame of the car—the platform of the car, so that it would not turn; had tried to turn the wheels on this rear axle and found they would not turn. The front axle, he said, was all right but that was not connected in any way with the handlebars.

Returning to the testimony of Anderson, in his examination in chief as a witness for plaintiff, he was again asked by plaintiff's counsel whether or not Neas, when found by him on the handcar, was in a position to be struck by the upward and downward movement of the handlebars and he repeated that he did not think he was. On cross-examination of this witness, the engineer, by counsel for defendant, he was asked to state what was the first thing that had attracted his atten-

tion to the pilot of his engine that night and he answered that it was sparks coming from it. "I saw some sparks coming from the front end of the engine that appeared to be from the engine truck wheels; there wasn't a great many of them, but I went out to see what the trouble was; a great many times it was caused by the flange of the wheel against the rail, or sometimes the journal getting hot and packing burning out of it, and that will cause the sparks to fly some, and that's what I went out to look after." When he saw those sparks flying had no idea or expectation that he was shoving anything ahead of him; got down on the steam chest to examine. The steam chest is about eight feet from the boiler head, eight or ten feet, and when he looked in front of his engine that was the first that he knew of any handcar or of anything of that kind being in front; as soon as he saw that he went back and stopped the engine. When the engine stopped he was a little past Benton City, where he passed a train going east which was on the sidetrack at Benton. Further explaining the position of the handcar, he said that the rear wheels were not on the track but were elevated clear up off the track and held up by the pilot; the pilot "was sort of under the handcar and elevated it up." The front wheels of the handcar were on the track when he stopped his engine and went down to see about the matter.

Charles Mackerson, the fireman of the train, examined as a witness by the defendant, testified that on the night of the accident he saw a few sparks flying from near the engine truck wheels; he got down off of his seat in the cab and looked out of the gangway to see what it was and to see where they were coming from; but he didn't see any more, as the sparks had ceased to fly, so he went back to his place, saying nothing to the engineer about having seen the sparks; supposed sparks came from cinders or some such thing. Directly after that the engineer called him over to his

side of the cab and told him to watch the engine while he (the engineer) went out to see what was causing the sparks he had seen near the engine truck wheels. The engineer went out the front door of the cab and walked along the running-board, came back and stopped the engine and told witness, his fireman, that he, the engineer, was pushing a handcar. The engineer got down with his torch, told the fireman to come and go with him and help get the man and handcar off the front end. They got down on the left side of the engine and walked to the pilot and then found a handcar with a man on it. The handcar was right in front of the pilot on the track. The nose of the pilot had wedged in on the boards of the handcar on the floor; knows that the front wheels were on the track but didn't notice whether the back wheels were raised or not; didn't look. The man was lying on the end of the car next to the pilot. This witness, the fireman, when asked in what position Neas was lying, said: "Well, I was right behind the engineer and he had him up in his arms; he raised up on the handcar, and I couldn't tell which way his head was lying, whether crossways or lengthways of the car." He helped move Neas from the handcar. The engineer and he carried him into the baggage car. They then got on the engine, called in the flag man and went on to Francis, the next station, about five or six miles distant. Both these witnesses testified that the running of the train made a good deal of noise, so that in talking to each other they had to talk loud. This testimony was given in connection with the evidence that was offered to show whether the engineer and firemen ought not to have heard the movement of the handcar or have heard or felt the shock or jar, when the engine hit it. The engineer of the passenger train which was waiting at Benton for this train to pass, testified that his train was on the switch when the train going west passed. He saw it coming, but he did not see either the handcar or the man on the handcar. After placing Neas in the

baggage car, the train went on to Francis and Neas was taken off there.  Whether dead when taken off the baggage car or dying very shortly afterwards, is not clear, it was admitted, however, that Neas, the husband of plaintiff, "died as the result of the accident of July 14, 1907."  A witness who saw him at Francis, a Mr. Smith, when he was brought in there, who then was engine hostler for the C. & A. R. R. Co., testified that when he saw Neas he was alive; had hold of him, laid his arm across his breast, laid his hand upon his breast and kneeled down over him, to see if he smelt of liquor, discovered no odor.  Neas was still alive.  When Smith first saw him he could not say whether he was conscious or unconscious, but they "couldn't get anything out of him."

We have, as we think, set out all of the facts in evidence as to the injuries to plaintiff's husband and as to the discovery by the engineer and fireman of the handcar with him on it, as to the condition of the handcar, as to the position of Neas.  There was evidence on the part of plaintiff's witnesses, outside of the engineer, that the headlight of a locomotive would throw a light far enough to distinguish a man at a distance of two or three hundred yards in front of the engine, but that for a hundred feet or less in front of the engine it would be in shadow or dark.  The engineer, when being examined by plaintiff as her witness, said the light would be thrown about sixty feet.  The witnesses for the defendant gave testimony to the effect that you could not see so as to distinguish any object on the track at a greater distance than from sixty to one hundred and twenty feet.  There was no controversy as to the speed of the train, all agreeing that it was running at a rate of about thirty miles an hour, at which rate it was testified it would cover about forty-four feet a second.  It was also in evidence that it was a dark night, no moon, not stormy, the track level between Martinsburg and Benton, no embankment or cuts and

nothing to obstruct the view along the whole strip. The engineer and fireman both testified in the most positive and unequivocal terms that they had been attending to their ordinary duties in the customary way, keeping a lookout ahead, looking after the firing of the engine, looking after the water gauge and steam gauge and other appliances, looking after the train generally, to look out for hot boxes, and that they had not seen the handcar, had not heard or felt the impact between it and pilot of the engine when it was struck, had not heard any noise of the grinding of the wheels and their attention only directed to it by the sparks that occasionally came out and which the engineer only discovered the origin of when he went out, walking along the running-board and from the end of that saw the handcar. Saw no lights and found no lanterns on the handcar. The engineer testified that he was not looking for a handcar to be on that part of his run that time of night. That he knew the rules of the company required a handcar to carry a white light in front and a red light in rear when out on the track at night; that he could see such lights about two miles off—that he saw no light or no handcar that night ahead of him. The engineer does not say in his testimony that he saw the man on the handcar when he walked forward on the running-board, merely saying that he saw the handcar. The fireman, however, as a witness for the defendant, testified that the engineer told him that they were pushing or shoving a handcar "with a man on it," and then the engine was stopped in the shortest space that it was possible to do so at the rate which this train was going, it being a heavy passenger, vestibuled train, with coaches and two or more sleepers. Both the witnesses testified that the bell was ringing continuously and that the ordinary whistles had been sounded at crossing between Martinsburg and Benton, but that no danger whistles had been sounded, no blasts given as customary when anything or person is seen on the track.

There was no controversy whatever over the fact that no lights of any kind were on the handcar. The rules of the company were introduced in evidence, there being evidence tending to show that a copy was in possession of the deceased, and these rules provide that when a handcar was taken out at night, it was required to have a white light in the front and a red light in the rear. Neas was section foreman of sections from Benton west to Francis; Martinsburg was not on his section. There was evidence tending to show that as section foreman, the deceased had been furnished with a red and white light. It was also in evidence that his superior on the road warned and forbade him to run a handcar alone. It appears from the evidence of the plaintiff that the deceased had gone down from Benton City to Martinsburg, which latter place was off of and east of his own section, that Saturday afternoon on the handcar, with four or more of his section hands, leaving Benton about half past five o'clock, reaching Martinsburg some time after six; that it usually took fifty minutes to make the run on a handcar between the two places. That on arriving at Martinsburg, the deceased and his gang of workmen had gone up to the town and had taken a drink or two together and that the deceased stayed around town until between twelve and one o'clock; that he had taken a few broken tools to leave at Martinsburg to be picked up by the local train. He went down to the station and with the assistance of a friend put the handcar on the track and started for his home at Benton City. A train going west had passed shortly before he put his handcar on the track and, according to the schedule time of trains, the train by which he met with the accident was due to pass Martinsburg in about an hour and twenty-five minutes thereafter. The evidence of defendant also tended to show that this friend of the deceased had protested against his going out without a light on his handcar; that the deceased said he knew all about the

trains, didn't need a light, refused to take one and said he had plenty of time to get home, and on his friend inviting him to stay all night with him, refused, saying that his wife and baby would be expecting him and that he was going home, and that was the last seen of him until found on the handcar by the engineer and fireman. Sometime between twelve and one o'clock that night, Neas, with the assistance of his friend, put his handcar on the track and started alone toward Benton, his home. That is practically all the evidence in the case. At the conclusion of the evidence of plaintiff in chief and again at the conclusion of the whole case, defendant interposed a demurrer, which was overruled and exceptions duly saved. The court at the instance of the plaintiff gave three instructions; it gave five at the instance of the defendant in the form asked by defendant and gave three more slightly modified, and refused twelve other instructions asked by the defendant. It also instructed on the form of verdict and on the number of jurors necessary to concur in a verdict.

In the view which we take of the case, it is not necessary to set out any of these instructions, except the first and second, given at the instance of plaintiff. The first in substance, told the jury that if they found from the evidence that the husband of the plaintiff, when killed, was in the employ of the defendant on one of its sections and engaged in running a handcar west over and along the line of the defendant's railway and that the locomotive and train of cars owned by defendant and run and managed by its servants and employees, "approached him from the rear on its said line of railway and he became and was in great and imminent peril of being struck, injured and killed by said locomotive and train of cars and defendant's said employees in charge of said train and locomotive became aware of his peril of being struck and killed or injured in time to have enabled them by the exercise of ordinary care to have sounded the whistle and have averted the in-

jury to said deceased, and they failed to exercise said care or sound said whistle, and that by reason of such failure to exercise ordinary care the said whistle was not sounded in time to avert said injury and the said Levi S. Neas was by said locomotive struck and killed, then the jury must find for the plaintiff, though the jury may find he was guilty of negligence in being at said place of danger."

The second instruction given is;

"And if the jury believe from the evidence that the engineer or fireman or other employees in charge of the train which struck the deceased saw the deceased on the track, and if the jury further believe that the deceased was unaware of his peril and was proceeding along the railroad track, unconscious of the approaching train, then it was the duty of such engineer or fireman or employee of the defendant, so observing the deceased, to give him proper warning of the approaching train, and it was his duty to give such warning by such a signal as was within his power, as could be likely heard and would be likely heard by any person possessing, in an ordinary degree, the sense of hearing in the position the deceased occupied. And unless, at the time of the injury, the employees of the defendant in charge of said train used the means at their command to provide for the safety of the deceased, after they discovered his imminent peril, the jury may find a verdict for the plaintiff in this case, although they may believe that the plaintiff was guilty of negligence in being upon the track of the defendant and in permitting himself to be inattentive to the dangers surrounding him."

The jury in the third instruction were told that if they found for plaintiff they should return a verdict in any sum not less than $2,000 nor more than $10,000.

Exception was duly saved in all these matters, the jury returning a verdict in favor of plaintiff for $2,000, and defendant filed in due time its motion for new trial, among other grounds alleging newly discovered

evidence and filing affidavits setting out what was claimed to be the newly-discovered evidence. The motion for new trial being overruled and exception duly saved, the case is here on appeal.

REYNOLDS, P. J. (after stating the facts).—We have set out the substance of the evidence in the case and following the earnest appeal of counsel for plaintiff may add, that we have read not only the testimony they have called our attention to but have read every line of the testimony as set out in the abstract. We are compelled to reverse this case for error contained in the first and second instructions given at the instance of plaintiff. The error in the first instruction is found in this: the jury are told that if they found that the defendant's employees became aware of the peril of deceased being struck and killed or injured "in time to have enabled them by the exercise of ordinary care to have sounded the whistle and have averted the injury to said deceased, and they failed to exercise said care or sound said whistle, and that by reason of such failure to exercise ordinary care the said whistle was not sounded in time to avert said injury and the said Levi S. Neas was by said locomotive struck and killed, then the jury must find for the plaintiff, though the jury may find he was guilty of negligence in being at said place of danger." In effect, this assumes that to have sounded the whistle would have averted the injury to the deceased. It assumes that if the whistle had been sounded the deceased would have heard it and would have removed himself from danger and so have avoided the danger. Granting that the engineer and fireman saw deceased and that in the exercise of ordinary care, to say nothing of their duty as human beings, they, aware of the peril in which the deceased was, had sounded the whistle, it does not follow, as a matter of law, nor as a fact that the jury would be warranted in assuming, that the accident would have been averted. Thus to

find that the sounding of the whistle would have averted the accident, the jury would have had to assume that deceased was awake, was sober, and that he heard it and had heeded it, and that he had time, after hearing the sound, to have removed himself from danger and avoided the accident. Assuming that at three hundred yards, the longest distance any witness swears the hand-car could have been seen, the engineer had blown the whistle as a danger signal, the train going forty-four feet a second, the deceased would have had to act almost instantly, or, the engineer, seeing the deceased paid no attention to the warning, would have had to act almost instantly and applied the brakes, otherwise the train would be down on the handcar. When we are dealing with seconds of time we have but slight margin to indulge in presumption. This involves deciding a case, not on a fact from which a given presumption may arise, but upon a presumption upon another presumption. [United States v. Ross, 92 U. S. 289; Bigelow v. Met. Street Ry. Co., 48 Mo. App. 367, l. c. 374; Warner v. St. L. & Mer. R. Ry. Co., 178 Mo. 125.]

The second instruction is wrong in this part of it, in which the jury are told: "And unless, at the time of the injury, the employees of the defendant in charge of said train used the means at their command to provide for the safety of the deceased, after they discovered his imminent peril, the jury may find a verdict for plaintiff in this case." That assumes, as did the other, that signaling on the part of the train men would have been heard by the deceased and would have been regarded by him and that hearing it and paying attention to it he could have saved himself by getting out of the way of the train. It also, in this part of it, assumes that the engineer and fireman discovered the peril in which deceased was. That was wrong and it was prejudicial error to have given it in this shape, without qualifying it with the caution that the jury must have found that the engineer or fireman had discovered the

peril of deceased. For the error in these instructions alone, the case will have to be reversed.

Going further however, we have here a case of gross negligence on the part of the deceased. He was an employee of the defendant, proven to have had actual notice of the rules of the company requiring him to use a red light and a white light on a handcar when using it at night. He had been warned not to run a handcar alone; he was familiar with the train times; he knew that this train was due to pass at this time. Under these facts and the absence of any direct evidence tending to prove that the engineer or fireman saw him at all, or that, by the exercise of ordinary care, they might have seen the deceased in time to have prevented the accident, and in the absence of any fact in evidence on which a presumption can rest, that if they had seen him, they could have prevented the accident, the humanitarian doctrine, or last clear chance doctrine, have no place here. Plaintiff's counsel did not rely, either by instructions asked and given, or in their argument, upon the theory that the engine crew might have seen deceased, but by instructions and by brief and by argument, they have rested their case solely on the theory that the engine crew did see the deceased, and that they saw him in time to have saved his life.

It is averred in the petition, in effect, that Neas was hammered to death by the handlebars beating on him after being struck down and while the handcar was being shoved forward by the swiftly moving engine. At the trial, in the examination of the engineer and fireman the fact was brought out and dwelt on, that the former, after seeing the sparks, had walked out on the running-board, some ten or twelve steps and back again, the train all the while in motion. All this evidently on the theory that if the engine had been stopped at once the life of the unfortunate man might have been saved. The evidence refutes this theory and removes the act of the engineer, in not coming to an im-

mediate stop when he saw the sparks, or certainly when he saw the handcar impaled on his engine, from the causal act. It was proven without contradiction that the handlebars could not have moved after the impact of the engine and handcar. There is no evidence tending to prove that the back or chest or body of the deceased were hammered. All that the evidence discloses is that his legs and arms were broken and his arms bruised. If we were to indulge in probabilities from known facts, they tend to the belief that the violence of the impact tore his hands from the bar and threw him with such force and violence as to break his limbs and in all probability injure him internally. His fatal injuries, so far as disclosed by the evidence, were received when the engine hit the handcar, and the delay of the engineer in stopping his train thereafter, did not contribute to the fatal result; to have stopped immediately after the impact would not, so far as the evidence shows, have saved the life of the poor man.

We are compelled to hold that the instruction in the nature of a demurrer to the evidence, asked by defendant at the close of the case, should have been given. So holding, the judgment of the circuit court is reversed. All concur.

