ELMER ROSS, Respondent, v. JAMES C. DAVIS, Agent under the Federal Transportation Act, Appellant.

In the Kansas City Court of Appeals, March 5, 1923.

1. **NEGLIGENCE: Humanitarian Rule:** In an Action for Damages as Result of Collision Between Train and Motor Truck, Evidence Held Insufficient for Submission to Jury Under Humanitarian Rule. Evidence *held* insufficient for submission of case under the humanitarian rule for failure to slacken speed where there was no testimony that engineer could have sufficiently slackened speed of train after seeing a truck approaching, within the time allowed, and have thereby averted collision and injury.

2. ———: **Failure to Warn:** Evidence Held Sufficient for Submission to Jury on Question of Engineer's Negligence in Failing to Warn

213 M. A.—14

After Seeing Truck. In an action to recover damages as result of collision between train and truck, evidence *held* sufficient for submission of case to jury on question of engineer's failure to warn after he saw truck start up incline toward crossing.

3. ———: Instruction: Humanitarian Rule: Failure to Warn: An Instruction Submitting Case upon Two Alleged Negligent Acts, One of Which under the Evidence was Insufficient to go to Jury, Held Erroneous. An instruction authorizing recovery which submitted case upon two of the alleged negligent omissions, namely, failure to warn and failure to slacken speed, *held* erroneous where under the evidence the case was limited and made to turn upon the sole question of the engineer's failure to warn after he knew that truck was going on crossing, and not stopping as he had anticipated.

Appeal from the Circuit Court of Jackson County.— *Hon. Charles R. Pence*, Judge.

REVERSED AND REMANDED.

*Virgil Yates* and *Mosman, Rogers & Buzzard* for respondent.

*F. H. Moore, Cyrus Crane, Hugh E. Martin* and *A. F. Smith* for appellant.

TRIMBLE, P. J.—Plaintiff was injured at a public railroad crossing, and in a suit for damages recovered a judgment for $1500 from which defendant has appealed. The crossing was that of the Kansas City Southern Railway over the highway known as the Raytown road near the eastern edge of Kansas City. At this point the railroad lies almost north and south, perhaps a little northeast, and the Raytown road lies northwest and southeast. Plaintiff, in approaching the crossing, was proceeding northwest along the highway, and was struck on the crossing by a northbound passenger train. The injury occurred about 9:30 in the morning of December 12, 1919, during the period when the railroad was under Federal control.

In addition to a charge of negligence in failing to

give the statutory crossing signals, the petition alleged a violation of the humanitarian rule in that, although the train operatives saw, or by ordinary care could have seen, plaintiff approaching the crossing in a position of peril and danger and oblivious thereof, in time thereafter by ordinary care to have averted a collision either by sounding a warning, slackening speed or stopping the train, yet they negligently failed to do so. However, the case was submitted upon instructions which embodied only the violation of the humanitarian rule, and hence that is the only ground of negligence with which we now have to deal.

Plaintiff was riding in a motor truck of which one, Wren, was the driver. The two men were employees of the Feeder's Supply Company and were returning from a delivery of feed stuff they had made. Wren was foreman over plaintiff and was in complete charge and control of the truck, plaintiff having no right to direct or control its movements.

The surroundings at the crossing presented an open and unobstructed view not only for those approaching on the highway but for train operatives approaching on the railroad. There was a bluff or hill immediately east of the railroad and extending to the edge of the right of way, but was south of the Raytown road and the crossing a distance of about 600 feet, according to the measurements given by defendant's surveying engineers, but only 300 or 400 feet according to plaintiff and Wren. However, they were only giving their estimate of the distance. Plaintiff says he never measured it, but thought it was only 300 or 400 feet and was giving his best judgment as to the distance. And Wren, in stating that one could see along the track for 300 or 400 feet as the crossing was approached, said one could see to the hill. The photographs show that at a point 200 feet back from the crossing one can see south along the track a short distance past the foot of the hill, and as the crossing is approached the view along the track increases

until, when one is forty feet from the crossing, the track can be seen for a quarter of a mile, and when one is twenty feet from the crossing he can see along the track further than that.

Plaintiff says that for half a mile (Wren says for a quarter of a mile), before one, in going northwest along the road, reaches the crossing, said road is on a down grade to a point ten or twelve or fifteen feet from the crossing, at which point the road goes up grade slightly to the top of the crossing which is on a ridge or grade from three to five feet in height. Both of these men say they coasted down hill toward the crossing at about eight or ten, or ten or twelve, miles per hour to the point where the grade started to rise and there they stopped an instant for two purposes, one to apply the power of "low gear" to the truck (no power being on in coasting), and the other to look for a train; that, seeing and hearing none, they then started up to and over the crossing at a speed of two miles per hour at the start. On cross-examination Wren said the truck was going two miles an hour when it was passing over the crossing, but admitted that at a former trial he said it was going four miles an hour. Plaintiff said it went over at a rate of two or three miles per hour, but it might have been three or four, he didn't know, he never drove a truck, but he too admitted that at the former trial he said it was going three or four miles an hour. Wren said, going at that rate, he could stop almost instantly, and with his foot on the accelerator as he had it then, the truck would pick up speed instantly if more gas were applied. Plaintiff says that the train struck them just as the front wheels of the truck, after crossing the second rail, dropped on the ground, and Wren says the train struck the truck just back of the cab about in the middle of the truck.

Wren says that as he came down the hill he had his foot on the brake and kept the truck under control; that as he came down he watched for a train, that he

watched as he stopped at the point ten or twelve feet from the track. When asked why he stopped, he said he was out of power, and one thing he stopped for was to look for a train or listen, and another thing was to throw his gear "into low" and make that grade; that he didn't give just an idle glance but looked carefully. He said he knew trains come by there frequently and that they came fast; that his stopping and looking and his starting forward on the track were instanteous. When asked how long he stopped at the point ten or twelve feet from the track, he said "Just about like that (indicating). Just barely stopped to throw it into gear, just an instant was all." And at that instant he was looking south. He said that at that point he could see along the track three or four hundred feet, "I could see as far as that hill." He was absolutely certain that he looked to the south and to the north when he stopped and immediately started up again, but thereafter did not look again, giving his attention to going over the crossing.

Plaintiff says that when they got within fifty feet of the track that he began looking and listening for a train. He looked north and south both, and also listended. He didn't see any train and didn't hear any; that he looked north and south and listened at the time the truck stopped but didn't see nor hear any; that he looked carefully and looked so far as he could see; that he didn't remember whethen Wren looked or not, but admitted that at the former trial he may have said Wren looked both ways, to the north and to the south; that the truck stopped, plaintiff looked, and immediately Wren put his truck in gear and started on over; that he knew the track was a pretty busy one and trains went over it pretty fast and he looked to make sure there was nothing approaching.

Plaintiff and Wren both say they heard no bell nor whistling nor signals of any kind. Plaintiff's witness Wimberly, who was sitting in the smoking car, but who

Ross v. Davis.

didn't remember which side of the car he was on, said he did not hear any whistle blown as the train approached the Raytown road crossing, nor did he hear any bell. He got on at Drexel, and on cross-examination said that between Drexel and the crossing in controversy the railroad crossed several roads but he couldn't remember whether there were any crossing signals given for them or not as he paid no attention, and didn't remember of any signal being given from Drexel at any time; that until the accident happened there was nothing to attract his attention, except that he had noticed that the speed of the train was rather excessive; that until he got to the crossing he did not observe whether any whistle had been blown or not. Nevertheless, when asked "You don't mean to say there wasn't any given and you don't mean to say there wasn't any given down here; you merely didn't observe it?" he replied "I mean to say there wasnt any given because I would have heard it if it had." He further testified that when the train stopped after the collision he got out and went forward to the engine, and that while he would not have been liable to hear the bell inside the car while the train was in motion, yet he was sure the bell was not ringing when he got outside. (The engineer testified that there was an automatic bell ringer which was started when the train entered Grand View, before the crossing was reached, and was not shut off till the train got to the Union Station in Kansas City.) On direct examination witness said that for a thousand feet back from the crossing the train was going from 44 to 50 miles per hour, and it continued at that speed until the airbrakes were put on; that his attention was attracted because in going around the curve the train lurched and he noticed that the train was going at a higher rate of speed than ordinary for it.

Another witness, Rowden, who was in the smoker sitting by the above-mentioned witness, and who was an ex-fireman, once having a run of the defendant railroad

which passed over this crossing, testified that as the train
came around the curve and got upon the straight track
leading to the crossing, his attention was called to the
train because of its unusual speed; that he heard no
whistles or signals given for the Raytown road crossing
nor any bell ring; that the train was two hours late and
was going 40 miles or more an hour; that the train was
running pretty fast when suddenly the car began jump-
ing and he "thought there was something off ahead of
us" and when the train came to a stop, he got off and
went down to the engine. The automatic bell ringer
was not working and no bell was ringing; that when the
train stopped, the rear end was fifty or maybe a hundred
yards beyond the crossing; that the way the train came
around the curve and down the hill toward the crossing
witness knew it was coming around there "as fast as
I ever rode in a Kansas City Southern engine." He
admitted having said at the former trial that he didn't
remember of the train whistling at various places and
that it may have whistled at those places and he not
heard it, but that what he meant was he never heard any
"danger signals." He said it was fifty-two miles from
Drexel to Kansas City and there was a crossing pretty
nearly every mile of the way; that he didn't remember
of the engineer whistling for any crossing from Drexel
on, that the engineer "probably did and me not notice
it;" that "if he (engineer) had not whistled from Drexel
to Kansas City I would have noticed that; I would have
wondered what was the matter with the whistle." He
further said, with reference to the whistling for other
stations, that he "may not have noticed it being a fire-
man" but that he "paid attention to the way they came
around that curve. Q. What curve was that? A. South
of that crossing."

The engineer, testifying for the defendant, said
that his train was two hours late; that he was in the cab
on the right side of the engine and as he came from
behind the hill, he, being 600 feet from the crossing

saw the truck about 200 feet therefrom moving toward the crossing at about the rate of fifteen miles per hour; he had blown a whistle for the Raytown crossing, but when he saw the truck he blew his whistle for the crossing 600 or 700 feet next beyond or north of the Raytown crossing, thinking that it would also serve to warn the truck if its occupants had not heard the whistle for the Raytown crossing; that he continued to blow his whistle to make sure that the occupants of the truck would hear it; that he did this until the engine was fifty or sixty feet from the crossing; that there was nothing to prevent the occupants of the truck from seeing him, and he thought the truck was going to stop before going on the track; that it was a common thing for drivers of motor vehicles to come up close to the track and stop and he thought this one was going to do that; that when the engine was only fifty or sixty feet from the crossing the truck started up the little incline and then he realized the truck ·was not going ·to stop; he was then so close to the crossing that all he could do was to reach over and put the emergency brake on and then felt the blow of the collision. He said that the truck in approaching ·the crossing did not stop before going on the crossing so far as he could see.

The engineer further testified that he was going thirty-five miles an hour. He had on the former trial testified that the train was going three times as fast as the truck and that the truck was going fifteen or twenty miles per hour, and when his attention was called to the fact that if this were true, his train must have been going from forty-five to sixty miles per hour, he said the distance he had said the truck was from the crossing when he first saw it was only an estimate or an approximation; that he did not give the "stock alarm,'" a succession of short blasts of the whistle, but as he approached the crossing, he gave first two long blasts of the whistle and two longer blasts; that he gave them to attract the attention of the truck·driver.

He also testified that the train traveled a greater distance while he was blowing the third and fourth blasts than it did during the blowing of the other two; that the third blast he made was longer because he knew then that the truck was going over the crossing. He further testified that he saw the truck as soon as the occupants of the truck could see him, if they were looking; that the men on the truck were in an enclosed cab and he *could not see them at all.* That there was a "pretty smart wind" blowing from the northwest, carrying the smoke of the engine and the sound of the whistle toward the back of the train; that after he blew the four long blasts the truck still kept coming; that he quit blowing the whistle when he got within 100 feet of the crossing, that he didn't give a short blast of the whistle then because he didn't have time as the engine was then only a length and a half away; that the brakes were on when he hit the truck; that in the former trial he testified that he threw the brake into emergency just as he hit the truck. He never tried to slacken the speed prior to the time he applied the emergency. He further testified that his train consisted of an engine and eight coaches; that the train was between 550 and 600 feet long; that going at thirty-five miles per hour he could ordinarily stop his train, under conditions there that day, in 575 feet; that he made a good stop that day, stopping in about the length of the train, the rear end being about on the crossing when the train stopped.

The engineer does not testify that when he first saw the truck he knew it was going to go across the track, but that "if it didn't stop" it would reach the crossing about the time he got there. And while he admitted testifying at the former trial that when he first saw the truck he thought it was going to make the crossing about the time he got there and that that thought came to him when he was 650 feet away and just before he began to whistle, yet a consideration of all of his former testimony that is revealed shows that

he did not mean he knew then the truck was going to cross, for he did not know or realize that until it started up the incline to the track.

The conductor, for defendant, testified that he was in the 5th coach from the engine and on his way to the smoker, and as they approached the Raytown crossing, he heard two long blasts of the whistle and after a short interval two other blasts the last being longer than the others, and, it being a little out of the ordinary and not a regular crossing whistle, it attracted his attention.

The fireman, for defendant, testified he was on the west side of the engine; that the automatic bell ringer was working and the bell was ringing; that at the Raytown road crossing he remembered a whistle was sounded but he couldn't say how many times, but on cross-examination he admitted that on the former trial he testified that the only signal that was given was for the crossing, consisting of four blasts of the whistle, two long and two short; the regular crossing whistle given about 300 yards from the crossing.

The brakeman testified for the defendant, saying he was in the rear of the smoker, and he heard a crossing whistle of two long and two short blasts about eighty rods from the crossing where the crossing signs were, and then heard the stock alarm, consisting of a succession of short blasts, about 300 feet from the crossing where stood an old elm tree.

The porter on the train testified that the only whistle he heard was the two long and two short blasts given about the time for whistling for the crossing, and just after he heard this crossing signal he felt the airbrakes on the wheels and the train began to stop.

Was a case made for the jury under the humanitarian rule, or should the demurrer to the evidence have been sustained?

The testimony presents a very unusual and peculiar case. The testimony in plaintiff's behalf, given explicitly, positively and repeatedly so that there can

be no mistake about it, is that the truck coasted down the hill to a point ten or fifteen feet distant from the track where it came to a momentary stop, during which the men looked along the track for 300 or 400 feet and Wren threw the gear into "low," and then the truck started up the little grade to go over the crossing. They say they saw no train, and, of course, do not attempt to say where the train was at that time, but the engineer says his engine was then only fifty or sixty feet away. If that is the situation and all there is in the case, then it is not seen how there can be any room for saying the engineer violated the humanitarian rule and thereby caused, or failed to avert, the collision. For, at whatever speed he was going within the limits disclosed by the evidence, he had less than one second in which to act and there is no showing that, if he had then acted, the truck, if then in the pathway of the train, would have gotten out, and, if not yet in its pathway, would have stayed out. This is true even though the engineer says he did not observe that the truck stopped before going upon the crossing. He *thought* it was going to stop, and as plaintiff says it did stop, how can it be said that he was wrong in that conclusion? Even if he did not consciously perceive the stop, owing to the angle at which he was approaching the truck and the brevity of its stop, can it be said that the impression created on his mind that it was going to stop was not justified, in view of the fact that it *did* stop? Besides, in coasting down the hill to where it stopped, it indicated such was what it was going to do. Plaintiff in his brief says that in coming down the hill it "gradually coasted to a stop."

Of course, if the engineer was justified in thinking the truck was going to stop (and it did stop), then he was justified in thinking also that the occupants saw the train and would not get in its way by going upon the crossing, and he would not be called upon to act in order to avert a collision until he saw and realized that

it was going to cross. So that, under the case as plaintiff's evidence presents it, the question of liability depends upon what should and could have been done by the engineer after the truck started up the little grade to the crossing, and whether, had he done anything, it would have resulted in the collision being avoided. It will not do to brush aside plaintiff's evidence that the truck stopped, and say that, notwithstanding that evidence, since the engineer says he did not observe the truck stop, the defendant is nevertheless liable if the engineer failed to warn or slacken speed at any time either prior or subsequent to the time he realized the truck was going to cross. So far as concerns the slackening of the train's speed after the truck started, there is no evidence that it could have slackened sufficiently, within the time allowed, to have in any degree averted the injury. And this is true even though the train may have been further away from the crossing than the engineer says it was. For even if it were further back, yet it traveled to the point of collision, from where it was at the time the truck started to go over the crossing, in the same time that the truck took to get from where it was to the point of collision, and the time would not have to be that long, but only long enough for the truck to get in the line of the train's path, for the moment it did that, the collision would still have happened unless the speed were so greatly reduced as to permit the truck time to get back out of the way or get fully across. The time occupied by the truck in getting from where it started, to the point where it was struck, was exceedingly brief, between three and five seconds, and the time it occupied in getting from where it started to where it was in the line of the train's pathway was less than that. And there is no evidence that, even in the longer time, a train as large and going as fast as this one was could have been slackened sufficiently to have avoided the collision. It is not enough that the engineer failed to slacken speed but it must also appear that had he slack-

ened speed the injury could likely have been avoided. There being no such evidence, the case, we think, should not have been submitted on failure to slacken speed.

But there was another charge in the petition, namely that he failed to warn plaintiff. A warning could be given almost instantly, and it could have been acted upon just as quickly, especially as the truck could have been stopped instantly or within the space of one foot. So that a jury could find that if a warning had been sounded as the truck started up the incline, it could have been stopped before the truck got into the pathway of the engine. According to the engineer's own evidence there was time to give such a warning for he claims to have given *two* after he knew the truck was going on, and he says that he, after that, applied the emergency and got back out of the way to keep from being struck by glass or other flying objects. While it is difficult to believe that the engineer, seeing the truck approaching the crossing, would neglect to sound his whistle, and after realizing that the truck was going to cross in front of his train, would still fail to sound a warning, yet the testimony in plaintiff's behalf was that no warning was given. We have studied this testimony carefully but do not think we are justified in holding that it is entirely devoid of evidential value, and this view is strengthened when the evidence of some of defendant's witnesses as to the warning they say was given, is considered. Hence we must view the case as one in which no warning was given; and as the engineer knew he had not previously warned, his duty to warn when he saw the truck start up the incline became absolutely imperative. Having failed to warn before, he certainly should have warned then and should have acted the instant he saw the truck start up the grade. If he had done so, can we say that conclusively the truck would not have been stopped before it got in the way of the train? We think not. On the other hand, there is room for the jury to find that had he then given a warning, the men could have stopped the truck in time to have avoided

being struck. Consequently we feel constrained to hold that there was a case for the jury on the question of the engineer's failure to warn. [Tavis v. Bush, 217 S. W. 274; Hale v. St. Joseph, etc., Power Company, 230 S. W. 113; Maginnis v. Missouri Pac. Ry. Co., 268 Mo. 667, 678.]

But the plaintiff's instruction embodying his cause of action and authorizing a verdict did not submit the case within the narrow compass to which his evidence confined it, but submitted it upon two of the alleged negligent omissions, namely, failure to warn and failure to slacken speed, that is, the instruction authorized the jury to find for plaintiff if defendant's engineer failed to do either, without any directions as to when the engineer should have begun to act. Under the instruction, the jury might well have found that the engineer did not have time to avert the injury after he saw the truck start up the grade, either by sounding a warning or slackening speed, but that as he did not begin to slacken speed and did not sound a warning when he first saw the truck and thought it was going to stop, the defendant was nevertheless liable. The instruction should have submitted the case within the precise and narrow limits of the case as made by plaintiff's positive and certain testimony, which made the case turn upon the question of the engineer's failure to warn *after he knew the truck was going on the crossing.* It would seem that it also should have required the jury to find that, if a warning had been given then, the occupants of the truck could have heard and acted upon it in time to have kept off of the track and out of harm's way. [Neas v. Chicago, etc., R. Co., 138 Mo. App. 484.] As we have heretofore stated, the case presented is unusual and peculiar, and the question of liability lies within very close and narrow limits, so that the instruction should submit it within those limits. The ordinary instruction applicable to humanitarian cases generally will not do where the situation is as it is here.

The judgment is reversed and the cause is remanded. All concur.